## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WALLACE CARTER**                                          **CIVIL ACTION**

**versus**                                                          **NO. 07-3136**

**N. BURL CAIN, WARDEN**                               **SECTION: "R" (3)**

## REPORT AND RECOMMENDATION

      This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Wallace Carter, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On October 17, 2002, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On November 7, 2002, he was sentenced to a term of life imprisonment without benefit of parole.[3]  On April 2, 2004, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[4]  On March 24, 2005, the Louisiana Supreme Court denied his related writ application.[5]

On March 6, 2006, petitioner filed with the state district court an application for post-conviction relief.[6]  That application was denied on March 24, 2006.[7]  Related writ applications were denied by the Louisiana First Circuit Court of Appeal on June 26, 2006,[8] and the Louisiana Supreme Court on April 20, 2007.[9]

---

[2]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 207; State Rec., Vol. I of IV, minute entry dated October 17, 2002; State Rec., Vol. I of IV, jury verdict form.

[3]  State Rec., Vol. II of IV, transcript of November 7, 2002; State Rec., Vol. I of IV, minute entry dated November 7, 2002.

[4]  State v. Carter, No. 2003-KA-0236 (La. App. 1st Cir. Apr. 2, 2004) (unpublished); State Rec., Vol. IV of IV.

[5]  State ex rel. Carter v. State, 896 So.2d 1030 (La. 2005) (No. 2004-KH-1350); State Rec., Vol. IV of IV.

[6]  State Rec., Vol. IV of IV.

[7]  State Rec., Vol. IV of IV, Judgment with Reasons dated March 24, 2006.

[8]  State v. Carter, No. 2006 KW 0695 (La. App. 1st Cir. June 26, 2006) (unpublished); State Rec., Vol. IV of IV.

[9]  State ex rel. Carter v. State, 954 So.2d 156 (La. 2007) (No. 2006-KH-1931); State Rec., Vol. IV of IV.

On May 7, 2007, petitioner filed the instant federal application for *habeas corpus* relief.[10]  In support of his application, petitioner raises the following claims:

1.  There was insufficient evidence to support petitioner's conviction;

    and

2.  Petitioner received ineffective assistance of counsel.[11]

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction becomes "final."   Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[12]

As noted, on March 24, 2005, the Louisiana Supreme Court denied petitioner's writ application challenging the state intermediate appellate court's judgment affirming his conviction and sentence.  For AEDPA purposes, his conviction became "final" ninety (90) days later when his period expired for seeking a writ of certiorari from the United States Supreme Court.  See <u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003); <u>Ott v. Johnson</u>, 192 F.3d 510, 513 (5th Cir. 1999); <u>Chester v. Cain</u>, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); <u>see</u>

---

[10]   Rec. Doc. 1.

[11]   In his federal application, the ineffective assistance claims were presented as three separate claims.

[12]   Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are inapplicable in the instant case.

also U.S. Sup. Ct. R. 13(1).  Accordingly, petitioner's period for seeking federal *habeas corpus* relief commenced on June 22, 2005, and expired one year later, unless that deadline was extended through tolling.

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).  Two hundred fifty-six (256) days of petitioner's one-year statute of limitations elapsed prior to being tolled by the filing of his state post-conviction application on March 6, 2006.  Although that application was denied, tolling continued uninterrupted until April 20, 2007, when the Louisiana Supreme Court denied the related writ application.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).[13]

When the statute of limitations resumed running at that point, a total of one hundred nine (109) days of the one-year period remained.  Petitioner's federal application was filed a mere seventeen (17) days later on May 7, 2007,[14] and it was therefore timely filed.

---

[13]   The state argues that this period of tolling does not apply to petitioner's claim challenging the sufficiency of the evidence because that claim was not raised in the post-conviction proceedings.  However, it is clear that a federal petitioner is entitled to tolling credit for any properly filed state application for post-conviction relief or other collateral review, regardless of the claims asserted therein, so long as the application attacks the same underlying criminal judgment.  Cowherd v. Million, 380 F.3d 909, 912-14 (6th Cir. 2004); Ford v. Moore, 296 F.3d 1035, 1038-40 (11th Cir. 2002); Sweger v. Chesney, 294 F.3d 506, 516-20 (3rd Cir. 2002); Carter v. Litscher, 275 F.3d 663, 665-66 (7th Cir. 2001); Tillema v. Long, 253 F.3d 494, 499-501 (9th Cir. 2001).

[14]   Petitioner signed his federal *habeas corpus* application on May 7, 2007.  Rec. Doc. 1.  That date represents the earliest date that petitioner could have presented his application to prison officials for mailing and, therefore, the earliest date that this Court could deem his *habeas* petition to have been filed for statute of limitations purposes.  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).

Because the federal application was timely filed, and because the state concedes that petitioner exhausted his state court remedies,[15] the Court will address his claims.

<u>Standard of Review</u>

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

---

[15]  Rec. Doc. 6, p. 2.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1); Hill, 210 F.3d at 485.

Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On May 30, 2000, the victim, Antonio Reed, was shot to death in Slidell.  The victim suffered gunshot wounds to his left thigh, left inguinal area, left arm, left shoulder, left hand, and the left side of his head.  None of the wounds were contact wounds.  The trajectory of two of the wounds suggested the victim was down on the ground and face up when the gunshot wounds were inflicted. Apart from the gunshot wounds, the skin of the victim had no tears, abrasions, or scrapes.  No gun was found on or around the victim. However, eight .45 caliber casings and one live round were recovered from the crime scene.  The casings were in two clusters and were all ejected from the same weapon.  The defendant was apprehended on a bus in Mississippi.  He had $450.00 in his pocket.
>
> On the date of the killing, Lula Hall heard multiple gunshots. She opened her door to investigate and saw the muzzle flash three shots and a man holding a gun pointed downwards.  Hall saw no other weapons outside.
>
> The defendant's live-in girlfriend, Bridgette Pitts, testified that, on the date of the killing, she sent the defendant on an errand to buy food for her.  After she realized that the defendant had been gone longer than he should have been, Pitts heard gunshots.  The gunshots stopped, but then started again after a few minutes.  When the defendant returned to his mother's house where Pitts was waiting, he had a gun in his hand and was walking quickly.  He stated, "Come on, let's go."

Thereafter, the defendant told Pitts he had "done something to somebody," and that he "just had to shoot somebody." The defendant claimed he shot the victim after he and the victim "got into it about something" and the victim attempted to draw his weapon on the defendant. The defendant told her, however, that after he first shot the victim, the victim begged for his life, stating, "You shot me enough, don't shoot me no more." The defendant told Pitts that when he realized the victim was not dead, "[he] went back and [he] shot him some more."

After the shooting, Pitts, Yorkester "Noonie" Crawford (the defendant's aunt), Johnvya Smith (Noonie's husband at the time of trial), and the defendant left to go to Pitts's house, where the defendant also lived, to get some clothes. At Pitts's house, the defendant told Pitts she could not call her mother because the telephone might be tapped.

Pitts, Noonie, Johnvya, and the defendant then traveled to Noonie's house in New Orleans. The defendant and Johnvya left the house in New Orleans together, but later returned. The defendant left his bloody shoes at the house in New Orleans.

At the defendant's request, Pitts, Noonie, Johnvya, and the defendant then went to the home of LaTroy, the defendant's cousin, in Waterproof, Louisiana. The defendant told Pitts he planned to take a bus to North Carolina.

Johnvya Smith also testified at trial. Johnvya conceded that as a result of the assistance he gave the defendant in getting out of town and in disposing of the weapon, he had pled guilty to being an accessory to murder. On the date of the shooting, he and Noonie had traveled from New Orleans to Slidell to look at a house across the street from the home of the defendant's parents. While Johnvya and Noonie were waiting in Johnvya's car for the defendant's parents to return home, Johnvya heard two separate bursts of gunfire. The defendant then approached Johnvya's vehicle carrying a gun and asked to be taken to Johnvya's home in New Orleans. Johnvya complied with the defendant's request.

At the house in New Orleans, the defendant changed his clothes and tennis shoes. The defendant's tennis shoes had blood on them. The defendant then asked Johnvya to take him to a pay telephone, and Johnvya took the defendant to a pay telephone at a gas station. Before getting back into Johnvya's car at the gas station, the defendant sprayed gasoline on his arms.

The defendant next asked Johnvya to take him to a motel across the interstate. The defendant told Johnvya the person the

- 7 -

defendant would be meeting at the motel would give the defendant some money. A vehicle approached the motel, and the defendant got into the vehicle. The defendant and the person driving the vehicle left the motel for approximately five minutes. When the defendant returned, he was unhappy with the person in the vehicle, and he told Johnvya the person in the car would not do anything for him.

Johnvya and the defendant then returned to the house in New Orleans. Thereafter, the defendant told Johnvya, "John, you're going to bring me to the country." Johnvya drove the defendant to Waterproof, Louisiana.

Upon arriving in Waterproof, the defendant told Johnvya he had left the gun under the mattress of Johnvya's bed in New Orleans. When Johnvya returned to the house in New Orleans, he found the gun under his mattress. He also found the bloody shoes. Johnvya threw the gun in a river, and threw the shoes over his back fence. During the entire time they were together, the defendant never told him he shot the victim in self-defense. Instead, the only comment the defendant made to Johnvya concerning the killing was "John, I had to bang a nigger up."

Yorkester "Noonie" Crawford also testified at trial. Noonie also conceded that as a result of her involvement in the victim's killing, she had pled guilty to being an accessory to murder. Noonie also heard two bursts of gunfire while waiting for the return of the defendant's parents on the day of the killing. The defendant then walked up and asked for a ride to his home. He was "calm, cool, and collected." Noonie and Johnvya drove the defendant and Pitts to the defendant's home, and the defendant and Pitts took some clothes from the home and returned to the car. Noonie, Johnvya, the defendant, and Pitts then went to Noonie's and Johnvya's home in New Orleans. The defendant took off his clothes, including his bloody tennis shoes. Noonie, Johnvya, the defendant, and Pitts then went to Waterproof, Louisiana. The defendant told Noonie he had fired ten shots and shot the victim in the head after the defendant turned around and the victim was "looking[.]" The defendant also told Noonie he loved the victim but "did it for a hit." In a statement given on the day after the killing, Noonie stated the defendant called someone who had a burgundy Expedition and told Johnvya that the man was supposed to bring him $1,000.00 but did not.

On May 31, 2000, the defendant gave an audiotaped statement concerning the killing. The defendant claimed he shot the victim after the victim confronted him, stating, "Man, I don't want to F with you," accused him of talking "behind a niggers back," and stated "I

got something for you." The defendant claimed he pulled out his .45 following the victim's statements and after the victim "went behind his back." The defendant claimed the victim responded by stating, "Oh, you pulling a gun on me," by taking his shirt off, by filling his chest with air, and by charging at the defendant. The defendant claimed his gun "went off." The defendant claimed he traveled directly from New Orleans to Waterproof. He also claimed he gave the gun to Johnvya after Johnvya asked for the gun. The defendant denied shooting the victim after he fell to the ground and denied receiving any money for the killing.

At trial, the defendant claimed that when he approached Noonie, Johnvya, and Pitts after the killing, he told them he had to kill the victim because the victim was trying to kill him and he had not wanted to kill the victim. The defendant also claimed to have seen the victim holding a gun with an extended magazine prior to opening fire on him. The defendant stated that he did not shoot the victim after the victim fell to the ground. The defendant denied intentionally pouring gasoline on his arms to eliminate gunpowder residue following the killing, claiming instead that he had accidentally spilled gasoline on his left arm while filling Johnvya's car with gasoline. The defendant admitted he wrote a letter to his cousin, Jerome "Pookie" Battle, following the killing wherein he stated, "Bro, I laid there and had the police believing that bitch nigger did it, and they was about to let me go[,] but Noonie said that I kidnapped her and him and made me bring them to the country by LaTroy."[16]

<u>Sufficiency of the Evidence</u>

Petitioner claims that there was insufficient evidence to support his conviction. The United States Fifth Circuit Court of Appeals has noted that claims of insufficient evidence are to be analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979):

In considering challenges to the sufficiency of evidence in habeas proceedings, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any

---

[16] <u>State v. Carter</u>, No. 2003-KA-0236, at pp. 2-6 (La. App. 1st Cir. Apr. 2, 2004) (unpublished); State Rec., Vol. IV of IV.

> rational trier of fact could have found the essential elements of the
> crime beyond a reasonable doubt."

Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Jackson, 443 U.S. at 319).  "The

Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence

determination, but rather whether it made a *rational decision* to convict or acquit.'"  Santellan, 271

F.3d at 193 (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).

A sufficiency of the evidence argument presents a mixed question of law and fact.

Taylor v. Day, Civil Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213

F.3d 639 (5th Cir. 2000).  Therefore, this Court must defer to the state court decision rejecting such

a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §

2254(d)(1).

Petitioner's claim that the evidence was insufficient to support his conviction was

raised on direct appeal and rejected by the Louisiana First Circuit Court of Appeal, which held:

> [T]he defendant contends the evidence used to convict him of second
> degree murder was insufficient because it did not discredit the fact
> that the victim was killed in self-defense and because two of the
> State's witnesses were felons, convicted of being accessories to the
> victim's murder.
>         The standard of review for sufficiency of the evidence to
> uphold a conviction is whether, viewing the evidence in the light
> most favorable to the prosecution, any rational trier of fact could
> conclude the State proved the essential elements of the crime and the
> defendant's identity as the perpetrator of that crime beyond a
> reasonable doubt.  In conducting this review, we also must be
> expressly mindful of Louisiana's circumstantial evidence test, which
> states in part, "assuming every fact to be proved that the evidence
> tends to prove, in order to convict," every reasonable hypothesis of
> innocence is excluded.  LSA-R.S. 15:438; State v. Wright, 98-0601,

- 10 -

p. 2 (La. App. 1ˢᵗ Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157, State ex rel. Wright v. State, 2000-0895 (La. 11/17/00), 773 So.2d 732.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.  When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.  Wright, 98-0601 at p. 3, 730 So.2d at 487.

The crime of second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1 A.(1).  Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  LSA-R.S. 14:10(1).  Though intent is a question of fact, it need not be proven as a fact.  It may be inferred from the circumstances of the transaction.  Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances.  Specific intent is an ultimate legal conclusion to be resolved by the fact finder.  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person.  State v. Lucas, 99-1524, p. 3 (La. App. 1ˢᵗ Cir. 5/12/00), 762 So.2d 717, 720.

When a defendant charged with a homicide claims self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense.  State v. Rosiere, 488 So.2d 965, 968 (La. 1986).

Louisiana Revised Statute 14:20, in pertinent part, provides:

A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
. . .

However, LSA-R.S. 14:21 provides:

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.

The relevant inquiry on appeal is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. Rosiere, 488 So.2d at 968-69; see also State v. Wilson, 613 So.2d 234, 238 (La. App. 1st Cir. 1992), writ denied, 93-0533 (La. 3/25/94), 635 So.2d 238.

After a thorough review of the record, we are convinced the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator of that offense. The verdict rendered against the defendant indicates the jury rejected the defendant's testimony and accepted the testimony of the State's witnesses. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 99-0385, p. 9 (La. App. 1st Cir. 11/5/99), 745 So.2d 217, 223, writ denied, State ex rel. Johnson v. State, 2000-0829 (La. 11/13/00), 774 So.2d 971. On appeal, this Court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Glynn, 94-0332, p. 32 (La. App. 1st Cir. 4/7/95), 653 So.2d 1288, 1310, writ denied, 95-1153 (La. 10/6/95), 661 So.2d 464.

Additionally, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could find that the evidence presented by the State established that the defendant was the aggressor in the conflict and, thus, was not entitled to claim self-defense. Further, even if it could be found that the defendant was not the aggressor, any rational trier of fact could find, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant did not act in self-defense. The defendant repeatedly shot the victim at close range and fled the scene. The defendant's flight from the scene after the incident was inconsistent with a theory of justifiable homicide. See State v.

<u>Wallace</u>, 612 So.2d 183, 191 (La. App. 1ˢᵗ Cir. 1992), <u>writ denied</u>, 614 So.2d 1253 (La. 1993).

Moreover, when a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls; and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. <u>State v. Henderson</u>, 99-1945, p. 9 (La. App. 1ˢᵗ Cir. 6/23/00), 762 So.2d 747, 754, <u>writ denied</u>, 2000-2223 (La. 6/15/01), 793 So.2d 1235. No such hypothesis exists in the instant case.

This assignment is without merit.[17]

For the reasons noted by the state court, any rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of second degree murder beyond a reasonable doubt. Petitioner clearly has not demonstrated that the state court's decision rejecting his claim challenging the sufficiency of the evidence was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective. In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>See Strickland</u>, 466 U.S. at 697.

---

[17] <u>State v. Carter</u>, No. 2003-KA-0236, at pp. 6-9; State Rec., Vol. IV of IV.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim.  Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson,

- 14 -

227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

The state district court rejected petitioner's ineffective assistance of counsel claims, holding: "The court finds that the defendant does not satisfy the Strickland test regarding deficiency of counsel's performance.  The claim falls for failure of the defendant to meet his burden of proof."[18] Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting such a claim unless petitioner shows that the decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  For the following reasons, petitioner has made no such showing in this case.

Petitioner first claims that counsel was ineffective in failing to challenge the arrest warrant on the ground that it was procured based on police misrepresentations.  He opines that a hearing on the arrest warrant should have been held pursuant to Franks v. Delaware, 438 U.S. 154 (1978), and its progeny.

In Franks, the United States Supreme Court confronted the question of whether "a defendant in a criminal proceeding ever ha[s] the right, under the Fourth and Fourteenth

---

[18]   State Rec., Vol. IV of IV, Judgment with Reasons dated March 24, 2006.  The Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court rejected petitioner's related writ applications.  State v. Carter, No. 2006 KW 0695 (La. App. 1st Cir. June 26, 2006) (unpublished); State ex rel. Carter v. State, 954 So.2d 156 (La. 2007) (No. 2006-KH-1931); State Rec., Vol. IV of IV.

Amendments, subsequent to the *ex parte* issuance of a search warrant, to challenge the truthfulness

of factual statements made in an affidavit supporting the warrant." Franks, 438 U.S. at 155. The

Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that
> a false statement knowingly and intentionally, or with reckless
> disregard for the truth, was included by the affiant in the warrant
> affidavit, and if the allegedly false statement is necessary to the
> finding of probable cause, the Fourth Amendment requires that a
> hearing be held at the defendant's request. In the event that at that
> hearing the allegation of perjury or reckless disregard is established
> by the defendant by a preponderance of the evidence, and, with the
> affidavit's false material set to one side, the affidavit's remaining
> content is insufficient to establish probable cause, the search warrant
> must be voided and the fruits of the search excluded to the same
> extent as if probable cause was lacking on the face of the affidavit.

Id. at 155-56. Although Franks involved a search warrant, it has been extended to cases involving

arrest warrants. United States v. Martin, 615 F.2d 318, 327-29 (5th Cir. 1980); see also United States

v. Daniels, 64 F.3d 311, 314 (7th Cir. 1995).

The arrest warrant in the instant case was issued based on Detective Betty Pinchon's

affidavit, in which she stated in pertinent part:

> Wallace Carter Jr., B/M, DOB 7-28-79, did shoot Antonio Reed
> numerous times causing the death of Antonio Reed in doing so
> Wallace Carter Jr. did commit the crime of Second Degree Murder in
> violation of RS 14:30.1. Travis Reed stated that Wallace Carter Jr.
> and Patrick Hall was all standing in front of the apartments located
> on Browns Village. Travis Reed observed Wallace Carter Jr.
> carrying a 45-caliber pistol, black in color and Carter placed the gun
> in his right rear pants pocket. Travis also stated that Carter was
> wearing a white shirt and blue jean pants when Wallace Carter Jr. and
> Patrick Hall departed from in front of the apartments located on
> Browns Village. Antonio Reed was last seen by Patrick Hall walking
> on East Hillcrest walking towards Wallace Carter Jr. and was
> observed as being the only two people on the street at the time, once

> Hall reached inside of his grandmother's residence while closing the front door, Hall heard several gunshots fired, at this time Mrs. Hall opened the door and saw a male in a white shirt leaning over the victim shooting into the body lying on the street.[19]

For the following reasons, this Court finds that petitioner has not shown that any false statements were knowingly and intentionally, or with reckless disregard for the truth, included in that affidavit. Petitioner argues that the affidavit's indication that Patrick Hall saw only petitioner and the victim on the street immediately prior to the shooting conflicts with a portion of a statement, purportedly given by Hall, attached to the federal application as Exhibit 3. However, even assuming that the attached statement is from Hall, it is *not* inconsistent with the information in the affidavit. Petitioner next argues that the statements attributed to Travis Reed in the affidavit are not included in Deputy Justin Kennedy's police report detailing his preliminary investigation immediately after the shooting.[20] While that is true, it proves nothing, in that the information could have been obtained from Reed at another time.

Petitioner clearly has not meet his burden of proof with respect to this claim. He has made no showing whatsoever that Pinchon's affidavit included any false statements; therefore, there is simply no basis for finding that counsel performed deficiently in failing to challenge the resulting warrant. Moreover, petitioner clearly has not established any resulting prejudice, in that he has not shown a reasonable probability that the result of the proceeding would have been different if only counsel had challenged the warrant.

---

[19]  Rec. Doc. 1, Exhibit 1.

[20]  That report is attached to the federal application as Exhibit 2.

Petitioner next claims that counsel was ineffective for refusing to engage in plea negotiations due to a fee dispute.  In support of that claim, petitioner has submitted a copy of a letter to his parents from his counsel, P. David Carollo, which states:

> Since I have not heard from you in the format of payment, I am assuming that Wallace is not interested in probation, but in fact, wants to go to trial.  I say that because I have heard nothing from you.  I discussed with you at the last conference the chances of getting Wallace on probation, and I have heard nothing else from you.
>
> This matter has dragged on far, far too long.  Make whatever arrangements necessary to have $4,350.00 paid into my office by **Thursday, May 30, 2002**.  Please do not call me with any excuses or delays, etc.  Just do it.  As you said over a month ago, you would have the money in three weeks, and that didn't happen.[21]

While this Court certainly disapproves of counsel's letter and tactics to collect his fee, petitioner has not established that he is entitled to relief with respect to this claim.  Even if the Court were to assume that counsel refused to undertake plea negotiations on his client's behalf, and were further to assume that counsel therefore performed deficiently, petitioner still must show that he was prejudiced as a result.  He has made no such showing in this case.  Petitioner was charged with the extremely serious and violent offense of second degree murder, a crime which carries a mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence,[22] and the evidence of his guilt was overwhelming.  Based on those considerations, this Court finds that the prosecution would have had little, if any, incentive to agree to allow him to plead to a lesser offense, much less one that would have resulted in a sentence of mere probation.

---

[21]  Rec. Doc. 1, Exhibit 7 (emphasis in original).

[22]  La.Rev.Stat.Ann. § 14:30.1(B).

A petitioner simply cannot establish that prejudice resulted from counsel's failure to engage in plea negotiations where, as here, there is no evidence whatsoever that the prosecution would have offered a plea bargain if one had been pursued.  See Wolfe v. Dretke, 116 Fed. App'x 487, 495-96 (5th Cir. 2004); see also United States v. Huddy, 184 Fed. App'x 765 (10th Cir. 2006); Weekly v. United States, No. 2:98CR0043, 2007 WL 2746781, at *2 (N.D. Miss. Sept. 19, 2007).

Petitioner also claims that counsel was ineffective in failing to object when the prosecutor disparaged petitioner's contention that he was able to fire first after the victim drew a gun.  Petitioner points to the following exchange during his cross-examination at trial:

> Q.    Again, so as I understand your testimony here today correctly, is it your testimony that, first of all, you acknowledge that you're under the influence of Valium, you had been popping pills that day, correct?
>
> A.    Yes.
>
> Q.    So you're drugged and despite you being in a drugged state, Tony Reed is pulling out a gun before you do, and yet you're able to, in a drugged stated, draw after him and shoot at least eight shots and he doesn't get off a single shot, that's what you want this jury to believe, correct?
>
> A.    Exactly. ...[23]

The prosecutor then revisited the issue in his closing argument:

> And the defendant wants you to believe, this is his version, not – he is under the influence of Valium that day, and yet, despite being under the influence of Valium, he is able to draw a gun after Tony pulls a gun and gets off, we know, at least eight shots at the victim, who's not under the influence of Valium does not get off a

---

[23]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 155.

single shot.  That's the version he wants to feed you all.  Again, the evidence doesn't support it.[24]

This Court finds that neither the questions nor the argument was improper.  Any objection would have had no merit, and, therefore, counsel cannot be considered to have performed deficiently in failing to lodge one.  "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."  Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994).  Moreover, in any event, petitioner clearly has shown no prejudice.  There is simply no basis for finding that there is a reasonable probability that the result of the proceeding would have been different if counsel had objected to the comments.

In connection with the preceding claim, petitioner additionally alleges that his counsel "withheld" pertinent evidence, i.e. a coroner's report showing that a post-mortem blood test found that the victim had alcohol in his system.[25]  Petitioner essentially claims that if counsel had presented that evidence at trial it would have shown why he, even while under the influence of Valium, was able to fire first when the victim allegedly drew a gun.  However, the coroner's report stated that the victim had *no* drugs in his system and his blood alcohol level was only 0.05%.[26]  In light of those facts, counsel can hardly be found to have performed deficiently for choosing not to

---

[24]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 183.

[25]  Rec. Doc. 1, Exhibit 8.

[26]  That is hardly a significant level.  For example, it is well below what is necessary to support a charge of driving while intoxicated.  See La.Rev.Stat.Ann. § 14:98(A)(1)(b) (requiring a blood alcohol level of 0.08%); see also La.Rev.Stat.Ann. § 32:662(A)(1)(a) (in drunk driving cases, it is presumed as a matter of law that a driver twenty-one years of age or older was not under the influence of alcoholic beverages if his blood alcohol level was 0.05 % or less).

launch an inquiry into who was more impaired, the petitioner or the victim, by presenting the evidence in question.  Surely, counsel understood that the jurors' patience was already being strained by the ludicrous "self-defense" theory, especially in light of the facts that (1) there was no evidence whatsoever that the victim even had a gun;[27] (2) petitioner was seen by Lula Hall firing downward, presumably after the victim was already on the ground;[28] (3) the autopsy suggested that two of the bullets were fired after the victim was already lying face up on the ground;[29] (4) petitioner told his girlfriend that he continued to shoot even as the victim begged for his life;[30] (5) petitioner told his aunt that he shot the victim in the head when he continued to look at petitioner after the initial shooting;[31] and (6) petitioner told his aunt that he shot the victim as "a hit."[32]  Counsel did not perform deficiently by failing to further alienate the jury by belaboring the issue of the comparative levels of impairment.  Moreover, in light of the overwhelming evidence that petitioner did not act in self defense, there certainly has been no showing that there is a reasonable probability that the result of the proceeding would have been different if only counsel had introduced the coroner's report.

---

[27]  State Rec., Vol. II of IV, transcript of October 17, 2002, pp. 95 and 105.

[28]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 24.

[29]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 81.

[30]  State Rec., Vol. II of IV, transcript of October 17, 2002, pp. 40-41.

[31]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 114.

[32]  State Rec., Vol. II of IV, transcript of October 17, 2002, p. 116.

Petitioner has not demonstrated that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, in light of the AEDPA's deferential standard, this Court likewise rejects those claims.

### RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Wallace Carter be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this fifth day of November, 2007.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**